

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th Floor*
*New York, New York 10278*

May 7, 2024

**By ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

   Re:   *United States v. Antwan Mosley*, 22 CR 343 (JMF)

Dear Judge Furman,

   The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled to proceed on Tuesday, May 14, 2024, at 3:00 PM. For the reasons set out below, the Government submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 181 to 211 months, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to avoid unwarranted sentence disparities among defendants, and above all to protect society from further crimes of the defendant.

   Defendant Antwan Mosley is the first defendant in this case to be sentenced by Your Honor.

## Background

### 1. Background on WashSide, a/k/a "Wash," and "Evertyhing4DayDay," a/k/a "E4D"

   The defendant Antwan Mosley was a member of a violent street gang known as "WashSide" or "Wash." He was also a member of subset of "Wash," known as Everything4DayDay or more commonly E4D. PSR ¶ 35. Wash was based in the neighborhood in the vicinity of the intersection of Washington Avenue and East 169th Street in the Bronx from at least 2015 through 2022. PSR ¶ 36. This neighborhood runs along its namesake Washington Avenue and encompasses the Morris Houses, a large public housing development that lies on both sides of Washington Avenue between East 169th Street and East 170th Street. PSR ¶ 36. Members of Wash were largely current or former residents of this neighborhood who publicly professed loyalty to the neighborhood and each other through public social media posts. PSR ¶ 36.

Members of Wash participated in numerous violent acts, including acts of violence against rival gang members and robberies, as well as transported stolen property interstate as part of a wide-ranging campaign of pillaging numerous commercial establishments stretching from New England throughout the Northeast, Mid-Atlantic, South, and Midwest, sold controlled substances, and stole credit and debit cards for the purpose of committing wire and access device fraud.  PSR ¶ 37.

Wash consisted of a core membership that shared the common aims of protecting the territory of the gang, enriching the members of the gang through robbery, larceny, fraud, and drug trafficking, and enhancing the reputation of the gang by engaging in acts of violence against members of rival gangs. PSR ¶ 38.  Wash controlled the territory of its neighborhood where only its members and associates were permitted to congregate and move freely and sell drugs. PSR ¶ 38.  The members of Wash were expected to make money for the gang and to engage in acts of violence to protect the gang's territory and to target the members of rival gangs. PSR ¶ 38.  When members of Wash committed acts of violence, they gained heightened status within the gang, in that other members and associates respected the members who committed the violence more because of their acts of violence. PSR ¶ 38.  Additionally, members of Wash advertised the gang and glorified its criminal activities through social media posts.  PSR ¶ 38.

In this last respect, the defendant was an active presence on behalf of Wash and E4D on multiple social media platforms, regularly posting himself and appearing in the posts of other members of Wash that included photographs and video recordings of the members of Wash, including the defendant, displaying their "W" for Wash hand signs and a variety of contraband, including large quantities of currency and firearms.  The defendant particularly contributed to the online presence of Wash through his production and performance of rap music videos with other gang members, which he posted to YouTube, among other public venues.  An illustrative example is the rap music video titled, "Just Fine," posted on or about July 5, 2022 to YouTube and featuring the defendant, one of whose aliases is "laneswitch." (*See* https://www.youtube.com/watch?v=VumZvUgfUEE.)  In the music video, the defendant raps with multiple other members of Wash, including multiple co-defendants, and within the song's first twenty to thirty seconds specifically calls for the release of incarcerated fellow gang members ("free all da guys that's doin' real time" and "free gang"), celebrates the shooting and killing of other people ("when we been threw [*sic.*] blocks we get everything shot" and "call up Ra put them in a box"),[1] and insults a specific rival gang ("Six Third be talking to cops").  Towards the end of

---

[1] As is reflective of the defendant's own social media activities and those more broadly of Wash, the references here are to specific, real events, including completed acts of violence, and otherwise anticipates in a prophetic and chilling manner still later acts of violence.  For example, on or about June 30, 2022, less than a week before this music video was posted, the Court sentenced Co-Defendant Yaurel Centeno in a prior case to 144 months' imprisonment, the most serious incarceratory sentence as of then (and still now) imposed against any member of Wash, which was immediately and broadly discussed among members of Wash.  *See* Judgment, *United States v. Yaurel Centeno*, 20 CR 432 (JMF) (ECF No. 65).  As discussed in greater detail below, approximately ten months prior to this music video's posting, the defendant had himself participated in a drive-by shooting of rival gang members in which multiple innocent bystanders were hit ("when we been threw [*sic.*] blocks we get everything shot").  And in less than two months

the music video, the defendant, as is common throughout the self-aggrandizing social media presence of Wash, glorifies the murder of one of the previously referenced rival gang's members, Tyrone Almodovar, a/k/a "Benji," ("smokin' Benji" at 1:50), whom other members of Wash murdered on or about June 26, 2020. (*See* PSR ¶¶ 42-48).

As stated above, Wash had rival gangs, which its members referred to as "opps," and which were similarly rooted in nearby neighborhoods. PSR ¶ 39. From 2015 to 2022, members of Wash and members of other local rival gangs would initiate violence against each other whenever and wherever they saw one another, whether in one another territory's or elsewhere. PSR ¶ 41. The members of Wash and the rival gangs would then post on social media to brag about their shootings, taunt one another and promote their respective gangs on a regular basis.

Members of Wash armed themselves and committed multiple acts of violence against rival gang members, including killing a rival gang member on June 26, 2022. PSR ¶ 42-48. Wash members attempted to kill other rivals on numerous occasions, including a shooting on July 29, 2020 (PSR ¶ 52-55), a shooting on August 31, 2021, which is further discussed below and involved two young women being shot in the legs (PSR ¶ 63-64), and a shooting on August 19, 2022, where an innocent man was shot (PSR ¶ 70-74). On at least one occasion, Wash members viciously attacked and beat a rival gang member, kicking and stomping in his head and thereafter slashing him in the back. PSR ¶ 62. Wash members also participated in a violent armed robbery, where innocent store employees were thrown to the ground and had firearms pressed to their heads, (PSR ¶ 49-51), two violent, armed carjackings (PSR ¶ 65-69), and burglarized numerous businesses in New York and throughout the tri-state area and beyond (PSR ¶ 56-61). Finally, from at least 2015 through 2022, Wash members, including the defendant, regularly stole credit and debit cards from movie theatre patrons, and then used the stolen cards to purchase electronic goods and luxury clothing, resulting in more than $150,000 of fraudulently obtained goods. PSR ¶ 77-78.

## 2. Mosley's Participation in the August 31, 2021 Attempted Murder

On August 31, 2021, at approximately 1:00 AM, members of Wash, including Antwan Mosley, got into Co-Defendant Isaiah Thomas's car to go find members of Spectway, a rival gang. PSR ¶ 63. Before they left, Co-Defendant Jacob Baker showed his fellow Wash members, including Mosley, that he had a gun on him for the trip. Mosley and his fellow Wash members then drove to the territory of their rivals, Spectway, for the express purpose of finding rival gang members to shoot and kill, as retaliation for prior "beefs" with Spectway members. Upon reaching Spectway's territory, all the members of Wash in the car saw a group of people standing together and then called out this group to one another as containing multiple "opps." The group contained members of Spectway and Liman, another rival gang aligned with Spectway against Wash. After Mosley and the other Wash members all called out the presence of these rival gang members to one another, Baker fired from the car multiple times into the crowd, at which point there was return fire and Thomas sped away. At the time of the return fire, Thomas' car was hit, and Baker was

_____

from the posting of this music video, on or about August 19, 2022, "Ra" or Co-Defendant Rasheed Chapman participated in another shooting in the territory of Wash in which another innocent bystander was shot but fortunately not killed or "put [ ] in a box."

grazed in the foot by a bullet. The drive-by shooting was motivated as retaliation for prior "beefs" with members of Spectway.

The shots fired by Baker struck two wholly innocent young women who were present in the group with Spectway and Liman members, hitting both women in their legs. The two young women were both taken to hospital, one by ambulance and one by a private car before an ambulance arrived. PSR ¶ 64.[2] The latter young woman was found to have bullet fragments still lodged in her leg, which were later removed at the hospital. As Thomas' car raced away from the crime scene, two police officers manning a nearby footpost opened fire on the car, which did not stop and disappeared from the scene.

### 3. Procedural Background

On or about December 14, 2022 a grand jury sitting in the Southern District of New York voted a superseding indictment (the "S1 Indictment"), charging the defendant with one count of participating in a racketeering conspiracy from at least 2015 up to and including December 2022, in violation of 18 U.S.C. § 1962(c) ("Count One"), one count of attempted murder and assault in aid of racketeering on August 31, 2021, in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5) and 2 ("Count Eight"), and one count of during and in relation to a crime of violence, namely the aforementioned attempted murder, using and carrying a firearm and possessing in furtherance of that same crime of violence a firearm, which was brandished, and discharged and aiding and abetting the same on or about August 31, 2021, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and 2 ("Count Nine"), one count of committing wire fraud from in or about 2015 through December 2022, in violation of 18 U.S.C. §§ 1349 ("Count Twenty-One"); and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (b), and 2.

On January 24, 2024, the defendant entered a change of plea to Count 8 and a lesser included offense in Count Nine of the Indictment. PSR ¶ 30.

In terms of the defendant's adjustment to incarceration, the defendant has engaged in serious and repeated disciplinary conduct from January 2023 to March 2024, which are set forth in the PSR and further detailed in the incident reports obtained from the Bureau of Prisons and enclosed as Exhibit A. In particular, on or about October 25, 2023, with the assistance of a visitor, the defendant attempted to introduce drugs into the Metropolitan Detention Center ("MDC"), specifically two bags of marihuana and one bag of opium, which he was observed removing from a bag of potato chips that the visitor brought and which the defendant hid on his person. (*See* Ex. A (photographs of contraband)). For this offense, the defendant received a disciplinary sanction of 30 days' disciplinary segregation, 27 days loss of good conduct time and 180 days loss of visitation. PSR ¶ 32. After committing this very serious offense, and after pleading guilty in the present case, on or about February 21, 2024, the defendant proceeded to possess a dangerous weapon inside the MDC, a broken piece of plastic that was seized from amongst his property during a search and that he was in the midst of fashioning into a bladed weapon more than one

---

[2] The Government respectfully requests that the second sentence of PSR ¶ 64 be revised to state, "The two young women were both taken to hospital, one by ambulance and one by a private car before an ambulance arrived."

foot in length. (*See* Ex. A (photograph of contraband)). For this offense, the defendant received a disciplinary sanction of 30 days' disciplinary segregation, 41 days loss of good conduct time and 210 days loss of visitation. PSR ¶ 32. In addition to these two incidents, on or about March 6, 2024, the defendant used abusive and obscene language against a corrections officer, stating in response to his apparent disappointment over a substitute meal item, "you dirty bitch" and "amma [*sic.*] violate you every chance I get," for which he lost 90 days of commissary. Earlier, in or about January 2023 and May 2023, the defendant refused to obey an order on two separate occasions, receiving 15 days loss of visitation and 90 days loss of email and commissary, respectively. PSR ¶ 32.

In terms of the defendant's criminal history, the defendant has a prior conviction for criminal possession of stolen property in the fourth degree, wherein he stole a credit card from a movie theatre and attempted to use it at two stores in or about February 2019, offense conduct that was part of the conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, charged in Count 21 of the S1 Indictment. PSR ¶¶ 109, 114-16. In or about December 2019, the defendant was adjudicated a youthful offender and sentenced to a conditional discharge, resulting in one criminal history point and placing the defendant in Criminal History Category I. PSR ¶ 109.

## Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## Sentence

The Government respectfully submits that a Guidelines sentence is warranted given the seriousness of the offense conduct and the need to provide just punishment. In particular, for years the defendant chose to participate in a life of crime with a violent neighborhood street gang and did so with full knowledge that his fellow members were involved in all manner of violence that terrorized their local communities. Indeed, the defendant devoted his music videos and rap lyrics to bragging about the gang's violence and exalting the gang's multiple shootings and a brutal murder. Perhaps even worse, it is fair to characterize the defendant's role in this respect as developing and glamorizing the gang's reputation for violence, including that of individual members of Wash, who committed serious crimes of violence in keeping with their publicly celebrated reputations that the defendant helped develop. In this sense, the defendant's music not only imitated the real lives that he and his fellow gang members led, the real violence that they committed, but also, in a toxic, self-reinforcing loop, his life, their lives, went on to imitate his "art." t was the defendant's slew of music videos that helped recruit the next generation of Wash members to similarly choose a life focused on allegiance to the gang and violence towards the "opps."

But *far* more importantly, the defendant did not simply associate himself with and promote the activities of this violent gang (or fund its operations through years of preying upon movie theater patrons and others from whom he stole and defrauded), he directly participated in an extremely serious act of violence that easily could have killed someone and resulted in two young women, two wholly innocent bystanders being shot. As set forth above, in August 2021, the defendant chose to drive to rival gang territory for the express purpose of helping his fellow gang members find rival gang members to target, shoot, and kill. The defendant helped identify the targets, who were standing amidst a crowd on a busy public street, and fully supported his fellow gang member, who shot into that crowd of people multiple times. The defendant did this with the intent that someone be shot and killed, and two people were hit, but by pure luck, no one was killed. The defendant demonstrated a complete and total disregard for human life, and his actions caused serious harm not just to those two people who were shot and rushed to the hospital, but also to a whole block of residential buildings, full, almost without exception, of innocent people who

were forced to live alongside this senseless violence at their very doorstep. The fact that the defendant not only participated in this incredibly serious violence, but did so in connection with his ongoing association with a violent gang, further escalates the seriousness and dangerousness of the defendant's actions. Because of the defendant's own actions and the actions of his fellow gang members in Wash, entire communities in the Bronx were forced to live in near constant fear that violence could erupt at a moment's notice. We respectfully ask the Court to impose a sentence here on behalf of the public that in its substantial length imposes a severe punishment that communicates to the defendant and his fellow gang members just as much as the rest of the public itself how culpable the defendant is for his many decisions to live outside the law.

In this same vein, a Guidelines sentence is also necessary to ensure general and specific deterrence and promote respect for the law. For years, members of Wash chose to live according to their own code of conduct and with a total disregard for the law. For years, the defendant's daily existence was antithetical to a law-abiding life, choosing his allegiance to his fellow gang members over any regard for the law or the other members of his community, who were subjected to regular threats of violence. In addition, the defendant and his fellow gang members chose to make their living by stealing people's credit cards, which they used to buy electronic devices and designer clothing, constantly flashing literally thousands of dollars of currency in their social media posts, all of which was criminal proceeds. The defendant and his fellow gang members then used their extravagant display of wealth to recruit the next generation into dropping out of school and joining their violent gang. The need for deterrence is particularly strong in cases like this one, where the defendant and his fellow co-conspirators built their whole lives and social circle (of people that they consider family) around violence and illegal conduct. To put it simply, almost everything about the defendant's prior existence will need to change for him to even begin to live a law-abiding life and a serious sentence of imprisonment is necessary to deter him from returning to that old life, as well as to deter his fellow gang members and, most importantly, the next generation of people who are considering whether to join a gang.

In considering the need to ensure specific deterrence and protect the public from further crimes of the defendant, the defendant's conduct while in custody on this offense is alarming and speaks volumes to his ongoing danger to the community. In particular, the fact that the defendant chose to participate in smuggling drugs into the facility is alone serious conduct. But the fact that after being caught and punished for that conduct and then after pleading guilty in this case, and knowing that he faced a Guidelines sentence of 181 to 211 months' imprisonment, the defendant chose to possess a large and dangerous weapon that he was fashioning into a lethal plastic blade is frankly shocking. And that is of course on top of other disciplinary incidents, all of which, to varying degrees, reflect the defendant's recent mindset and his relationship with authority. Put differently, the fact that the defendant could not be dissuaded from possessing a *serious* weapon while he was in custody, facing near constant supervision, and just months away from being sentenced on extremely serious charges, is powerful evidence that a very serious sentence of imprisonment is needed here. Indeed, the defendant's conduct while in custody raises serious questions about the defendant's ongoing membership in and dedication to Wash. The defendant's letter speaks of a changed mindset and wanting to return home to a simple life with his newborn daughter, but his conduct, just in the last couple of months, demonstrates the opposite.

As noted in defense counsel's submission, the defendant saw from the experiences of his father, that living a life of crime came with serious consequences, including being separated from his family and his children. And yet, the defendant chose repeatedly and consistently to lead his own life full of crime, knowing full well the likely consequences for his many wrong choices. The Government is of course sympathetic to the circumstances of the defendant's upbringing and the tragic death of his mother in 2019, which are relevant considerations for sentencing. But, as the defendant acknowledges, he chose to involve himself in this violent gang even before the death of his mother, and by participating in the gang, he was perpetuating for even younger men and women than himself the very same conditions that he now cites as problematic influences on his upbringing. Moreover, the argument that the defendant is a product of growing up in a low-income and violent neighborhood ignores the fact that the overwhelming majority of citizens similarly born and raised in the South Bronx face many of the same conditions and challenges as the defendant and yet choose to live honest, law-abiding lives from the outset of their young adulthood, attending school and working to maintain lawful employment in the hope of improving their own lives and those of their families. But the defendant here made choices day after day to involve himself with a violent gang and to make his money by stealing from people who were trying to live honest, law-abiding lives. It cannot stand, and the defendant must answer for it now.

### Restitution

The Government is acutely conscious of its responsibility not only to the public but also the specific victims of crimes, particularly violent crimes, at the time of sentencing. The Government continues to work to make productive contact with the victims of the non-fatal shooting on or about August 31, 2021 for multiple reasons, including to ascertain their losses. Regardless of whether the Government is successful in doing so within the one week remaining before sentencing, given its statutory obligation for those victims to receive any appropriate restitution under the law, the Government respectfully requests that the Court set August 12, 2024 as the date for the final determination of any victims' losses pursuant to 18 U.S.C. § 3664(d)(5).

### Conclusion

For the reasons set out above, the Government respectfully requests that the Court impose a Guidelines sentence of imprisonment of between 181 to 211 months upon the defendant in order to reflect the seriousness of the offense, promote respect for the law, ensure adequate specific and general deterrence, and protect the public. Given the extended duration of the offense conduct and the risk of recidivism, the Government respectfully requests that the Court further impose a

sentence of supervised release of five years to provide every possible incentive for the defendant's eventual successful integration into society and rehabilitation.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Courtney L. Heavey
Thomas John Wright
Assistant United States Attorneys
(212) 637-2413 /-2295

cc: Ken Womble (Counsel to Defendant Antwan Mosley) (by ECF)